## ROBINSON v. PITTSBURG COAL CO. et al.

(Circuit Court of Appeals, Sixth Circuit.  May 4, 1904.)

No. 1,261.

1. MASTER AND SERVANT—INJURIES TO SERVANT—CAUSE OF INJURY—QUESTION FOR JURY.

In an action for injuries to a seaman by the breaking of a mast, caused by its being struck by a bucket of ore negligently swung from the hold by stevedores engaged in unloading a vessel, whether it was the erratic movement of the bucket which caused the accident, or whether the derrick engineer was negligent in attempting to swing the bucket from the hatch to the dock while such movement was going on, was for the jury.

2. SAME—FELLOW SERVANTS.

Where a seaman was injured by the falling of a mast, caused by its being struck by a bucket of ore being hoisted from the hold by a derrick engineer employed by a different master from the owner of the vessel, the seaman and the derrick engineer were not fellow servants.

3. SAME—PROXIMATE CONCURRING CAUSE.

Where a seaman was killed by the falling of a mast after it was struck by a bucket of ore negligently hoisted from the hold of the vessel by an engineer employed by another master to unload the vessel, in the absence of proof that the mast was not sufficiently strong to stand all the uses for which it was designed, and, if it had been entirely sound, it would have sustained, without breaking, the strain put upon it by the blow from the loaded bucket, the fact that the mast had become decayed was not a proximate cause of the accident.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Paul Howland and Charles F. Lang, for plaintiff in error.

Squire, Sanders & Dempsey, for defendant in error Pittsburg Coal Co.

H. H. McKeehan (Hoyt, Dustin & Kelley, of counsel), for defendant in error Pittsburg Steamship Co.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge.  This was an action to recover damages for the death of James Kerr, an employé of the Pittsburg Steamship Company, by the wrongful acts of that company and the Pittsburg Coal Company.  Kerr was employed as a watchman on the steamer Bartlett, and was killed while the boat was being unloaded by the Pittsburg Coal Company at its docks in Cleveland, July 1, 1901.  The Bartlett was a whaleback steamer loaded with iron ore.  At the time of the accident, Kerr was at the capstan on the forward turret, trying to heave the vessel closer to the dock.  The boat was being unloaded by revolving derricks located on and operated from the dock.  Next the turret was the foremast, and just aft of it hatch No. 1.  A heavy bucket of iron ore, lifted out of this hatch and swung forward and toward the dock, struck the lamp guy of the foremast.  The strain broke off the mast

¶ 2. See Master and Servant, vol. 34, Cent. Dig. § 485.

seven or eight feet from the top, just below an iron collar or band to which the lamp guys were attached. The falling piece struck and killed Kerr. An inspection of the piece showed the mast was rotten where it broke.

It was claimed that the steamship company was negligent in sending Kerr into a dangerous place without warning him, in permitting the rotten mast to be in and on the steamship, in causing the steamship to be heaved closer to the dock while the unloading operations were in progress, and in causing the unloading to be begun and continued without removing the foremast.

The coal company was charged with negligence in permitting the bucket to come into forcible contact with the lamp guys, thus breaking off the masthead, in continuing the unloading operations while the vessel was being moved closer to the dock, in continuing the unloading operations without adjusting the unloading machinery to fit the altered situation of the vessel when brought closer to the dock, and in permitting all five of the unloading derricks to be operated at the same time. The court arrested the testimony from the jury, and directed a verdict for each of the defendants.

1. The Bartlett landed at the dock in the morning. She was moored eight to ten feet from the dock, not being able to get nearer on account of her draught. While she was in this position, the coal company began to unload. The unloading began about 10:30 or 11 o'clock, and stopped at 12 for dinner. Work was resumed at 1 o'clock. During the forenoon, while the unloading was going on, the boat was hove in nearer the dock "two or three times, probably four times." At this time she was in charge of the mate, Moser. She was hove in by order of the foreman of the dock, Weddow, who said to Moser as soon as the boat was tied up, "Get her alongside of the dock as quick as you can." Altogether she was hove in about two feet in the morning, so that, when the men quit work at noon, she was six or eight feet from the dock. After the mate had had his dinner, he heard the buckets and machines going again, and he went on deck and ordered the deceased, Kerr, to go forward and heave the boat in, if he could, with the steam capstan. Kerr proceeded to execute the order. What then occurred was thus described by the mate:

"A. Kerr went up on the forward turret, and took the turns of the line off the timberheads, where the line was made fast to the dock; and he gave it the steam in order to heave her in, but I didn't see him heave her in. I didn't see that the capstan moved. So I said, 'did you get any, Jim?' and he says, 'I got a little;' and that moment I saw a bucket coming toward the spar and strike the lamp guy, and the topmast came down and fell on Kerr, and he dropped down, and I jumped on the forward turret"—

The foremast was of pine, about 35 feet long, 10 inches in diameter at the butt, and tapering toward the top. It was fastened to the deck by two pieces of iron, and was held in place by three wire stays; one running forward, and the other two to each side of the vessel. The stay nearest the dock was removed. The mast stood on a line running through the center of the hatch, about a foot and

a half forward of it and next the turret. About 7 or 8 feet from the top of the mast there was an iron collar or band, resting on a shoulder cut into the mast. From this collar, two iron arms extended out and forward, to which were attached two lamp guys (wire ropes three-eighths of an inch in diameter), which ran parallel with the mast, to the turret where they were fastened. The mast was used to carry the ship's lights, and the lamp guys to raise the lights. The lamp guys were about 14 inches apart and extended about 3 inches beyond the side lines of the mast. They were in front of the mast, probably a foot from it. The iron bucket was about 3 feet square, and, when filled with iron ore, weighed nearly a ton. It struck the lamp guys midway between the turret and the iron collar. The mast broke just below the collar. It was rotten there an inch deep all around.

Just before the accident the mate was standing a little behind the hatch out of which the bucket was hoisted, and on the dock side, 15 or 20 feet from Kerr. Asked whether the vessel was drawn in after dinner, he said:

"It was so little that I couldn't see, and that caused me to ask Kerr if he got any slack on the line at all. He said, 'Yes, a little.'"

Asked where the bucket was when he first saw it, he said:

"A. When it struck the guy—when it came swinging in towards the guy." The Court: How you mean 'swinging in?'" A. Out from the dock towards the center of the vessel."

Examined further upon the same point, he said:

"A. I saw the bucket swinging towards the mast. So it must have come this way. The Court: Where was it when you saw it? A. It was right in range of my view between me, and swinging in towards the mast. * * * Q. And when you saw it, was when it was swinging around in a circle towards the dock, when it caught the mast? A. It swung towards the mast. It didn't swing in a regular circle. Q. It swung towards the mast? A. Yes, sir. Q. When was that? A. When I first saw it. Q. And when was it that you first saw it? A. When it was about two or three feet away from the guy, swinging towards the mast. I can't tell you the exact time."

O'Boyle, the engineer who operated the derrick at hatch No. 1, testified that after dinner he swung an empty bucket from the dock, and lowered it into the hatch. He did this slowly. The bucket cleared the lamp guy 2 or 3 feet. He waited 10 or 15 minutes, and then raised and swung the loaded bucket, which struck the lamp guy and broke the mast. Asked to describe the motion of this bucket, he said:

"A. The bucket came up good and straight, but the momentum of the bucket was what caught him. I couldn't see the man, where he was, at all. It was the momentum of the bucket which caught the lamp guys. The Court: What do you mean by that? You say the bucket came up straight. A. Yes, sir. Q. Now you say the momentum of the bucket. Do you mean it swung out? A. Yes, sir; and I couldn't stop it. Q. When you turned the boom, the bucket swung out? A. Yes, sir. Q. How much did it swing from being in an upright position? A. About 3 or 4 feet."

On cross-examination the witness was asked:

"Q. I want to know if you did not say to Mr. Howland, there, that, after that bucket came up out of the hatch and started back for the dock, it was swinging back and forth? A. Well, a bucket naturally would swing back

and forth. Q. Did you say that to him? A. Yes, sir; I did. Q. And the bucket was swinging back and forth, you said, through the air, about 3 or 4 feet, didn't you? A. Yes, sir."

The witness, on cross-examination, testified that in the morning the boom was lower down, in order to reach out farther over the vessel. It does not appear when he raised the boom. He says he did not during the forenoon, and he evidently did not after dinner. It was his opinion the boat was moved in during the noon hour, but he did not see it. When he swung the empty bucket out to the hatch after dinner, he says it cleared the mast about two or three feet. He moved that bucket "slow."

This was substantially all the testimony with respect to the accident itself. There was some additional with respect to the rotten mast.

2. The court below, after holding that the rotten mast was not connected with the accident in a way to render the steamship company liable on that account (a ruling which we sustain), assumed that the occasion of the accident was "the bringing nearer together of the vessel and the machinery for unloading it," and, asserting that the deceased did this, and failed to notify either the mate of the vessel or the agent of the coal company of the extent of the movement of the vessel nearer the dock, held that neither the steamship company nor the coal company was liable under the circumstances.

We have examined the testimony carefully, and are at a loss to comprehend how the court below reached the conclusion that the only reasonable inference to be drawn from the testimony is that the vessel was hove in two feet nearer the dock during the noon hour, when the deceased tried to work the capstan, and that this was the cause of the accident. Instead of establishing these facts, there was proof which, in our opinion, tended to show that there was no movement of the vessel during the noon hour, when the deceased tried to operate the capstan, and that the cause of the accident was not the movement of the boat, but of the bucket. It was not the dock hands, but the sailormen, who hove in the boat. They were in command of the mate, and acted under his orders. The mate had been directed by the foreman of the dock hands to get the boat along side of the dock as quick as he could. He therefore was the one of all others who was in the best position to state when the boat was hove in. He testified she was hove in probably four times during the morning—in all, 2 feet. He directed Kerr to try and heave her in further after dinner, and Kerr tried to do this with the steam capstan. He was only 15 or 20 feet away from Kerr, and watching him closely, when he tried to work the capstan, yet he could not see any movement at all. That is why he asked Kerr whether he got any slack, and Kerr said, "A little." He might have got a little by the stretching of the line. The tendency of this testimony is to show that, in point of fact, Kerr did not move the vessel at all. If he had moved the boat but a few inches, the mate, watching closely the working of the capstan, would instantly have observed the movement.

Not only does the testimony fail to show with any degree of certainty that the boat was hove in by the deceased a distance sufficient to cause the bucket, in its regular course, to catch the lamp guy,

thus causing the accident, but it tends to show that the reason the bucket struck the lamp guy was because of its erratic movement, occasioned by the improper and negligent operation of the derrick by O'Boyle, the engineer on the dock. The mate and O'Boyle were the two persons who had opportunity to observe the motion of the bucket when it struck the lamp guy. They both testified that at the time the bucket was not swinging around on its regular circle from the hatch towards the dock, but out from the dock towards the mast—in other words, back and forth, or to and fro, across the line of its usual circular course. The mate was in a position—on the dock side of the vessel, just aft of the hatch—where he would notice such a divergence of the bucket from its regular course. He says the bucket "came swinging towards the guy"; "swinging out towards the mast"; "it swung towards the mast"; "it didn't swing a regular circle." The derrick engineer says the bucket came up good and straight, but "it was the momentum that caught him," and, asked to explain what he meant by the momentum, said the bucket "swung out," and he could not stop it; that "it swung out about 3 or 4 feet." On cross-examination he admitted that he had stated that the bucket "was swinging back and forth about 3 or 4 feet."

The engineer testified that, when the empty bucket was swinging slowly from the dock to the hatch, it missed the mast and the lamp guys by only two or three feet. He had the means, therefore, of knowing that the loaded bucket, swinging back and forth, across the line of its course and towards the mast, a distance of about three or four feet, as he put it, was liable to hit the mast or the lamp guys if swung around while that erratic movement continued.

One of the claims of the petition is that the coal company was negligent in permitting the loaded bucket to strike the lamp guys, and thus break the mast. In view of the testimony to which we have called attention, we think it was clearly a question for the jury to determine whether it was the erratic movement of the bucket which caused the accident, and whether the coal company, through its employé, the derrick engineer, was negligent in attempting to swing the bucket from the hatch to the dock while this movement was going on. Dunlap v. N. E. R. R., 130 U. S. 649, 9 Sup. Ct. 647, 32 L. Ed. 1058; R. R. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Richmond & Danville R. R. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748, 37 L. Ed. 642; Gardner v. Mich. Cen. R. R., 150 U. S. 349, 14 Sup. Ct. 140, 37 L. Ed. 1107. The deceased was not, in the view we take of the case, a fellow servant of the derrick engineer, nor did he assume the risk of being injured by the negligence of servants of the coal company engaged in unloading the vessel.

3. While unable to agree with the court below that there was no proof presented to sustain a verdict in favor of the coal company, we approve of its action in directing a verdict for the steamship company. The claim against the latter turned upon the part played in the accident by the rotten mast. There was no testimony tending to show that the mast was not strong enough to stand all the uses for which it was designed and employed, namely, the carrying of lights and signals, and no testimony tending to show that the mast, if en-

tirely sound, would have sustained, without breaking, the strain put upon it by the blow of the loaded bucket when it struck the lamp guy. The steamship company could not be held liable for failing to guard against an accident which it had no reason to anticipate, either by providing a stronger mast, or by warning the deceased not to stand near the mast while the derrick was being operated.

The judgment of the court below is affirmed as to the Pittsburg Steamship Company, but reversed as to the Pittsburg Coal Company, and the case remanded for a new trial.